**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIGVIJAY MOTIANI, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>    v.<br><br>FUTURE US LLC,<br><br>                                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Digvijay Motiani ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Future US LLC ("Defendant") owns and operates a website, TechRadar.com (the "Website").

2.      When users visit the Website, Defendant causes three Trackers—the TripleLift Tracker, GumGum Tracker, and Audiencerate Tracker (the "Trackers")—to be installed on Website visitors' internet browsers.  Defendant then uses these Trackers to collect Website visitors' IP addresses.

3.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b); s*ee also Greenley v. Kochava, Inc.,* 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## PARTIES

6.      Plaintiff Motiani resides in Santa Clara, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff was in California when he visited the Website.

7.      Defendant Future US LLC is a California limited liability company with its principal place of business in New York City.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at lease one class member is a citizen of a different state than Defendant.

9.      Defendant is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(d), and Defendant is therefore "a citizen of the State where it has its principal place of business [New York] and the State under whose laws it is organized." *See* 28 U.S.C. § 1332(d)(10).  Thus, this Court has personal jurisdiction.

10.      Venue is proper in this Court because Defendant resides in this District.

## FACTUAL ALLEGATIONS

## I.      THE CALIFORNIA INVASION OF PRIVACY ACT

11.      The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

12.     As relevant here, CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

13.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

14.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

15.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

16.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology advanced, however, courts have expanded the application of these surveillance devices.

17.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

18.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal.

Sep. 26, 2013); *see also Greenley*, *supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

19.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA section 638.51—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

## II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A.     The Trackers Are "Pen Registers"

20.     To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests. *See* Figure 1.

**Figure 1:**



21.     The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

22.     In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address—to TripleLift, GumGum, and Audiencerate.

23.     The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

24.     Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location.

25.     Through an IP address, the specific device's state, city, and zip code can be determined.

26.     Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.  Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[1]

27.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[2] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[3]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or

---

[1] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA, https://www.accudata.com/blog/ip-targeting/ (last visited April 17, 2024).

[2] *Location-based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/ (last visited April 17, 2024).

[3] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

service"[4] *because* "[c]ompanies can use an IP address … to personally identify individuals."[5]

28.     For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis.[6]  Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[7]

29.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[8]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[9]

30.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[10]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[11]

31.     As alleged below, Defendant installs the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information—users' IP addresses—

---

[4] *IP Targeting: Understanding This Essential Marketing Tool*, *supra* note 1.

[5] Trey Titone, *The future of IP address as an advertising identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[6] *See, e.g.*, *IP Targeting: Understanding This Essential Marketing Tool*, *supra* note 1.

[7] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns (last visited April 17, 2024).

[8] Williams, *supra* note 3.

[9] *Id.*

[10] *Id.*

[11] *Id.*

that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Trackers are "pen registers."

        *1.*    *TripleLift Tracker*

32.    TripleLift is a software-as-a-service company that develops the TripleLift Tracker, which it provides to website owners, like Defendant, for a fee.

33.    According to TripleLift, its "technology powers ads that make advertising better for everyone—higher performing for brands, more lucrative for publishers and more respectful of the consumer's experience."[12]

34.    In other words, TripleLift enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales. To achieve this, TripleLift uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

35.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the TripleLift Tracker on the user's browser. The TripleLift Tracker, in turn, instructs the user's browser to send TripleLift the user's IP address.

36.    Moreover, TripleLift stores a cookie in the user's browser cache. When the user subsequently visits Defendant's Website, the TripleLift Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the TripleLift Tracker causes the browser to send the cookie along with the user's IP address to TripleLift. A general diagram of this process is pictured as Figure 2, which explains how the Website causes the TripleLift Tracker to install a cookie on the user's browser instructs the user's browser to send the user's IP address through the cookie. *See* Figure 2.

**Figure 2:**

---

[12] *Technology*, TRIPLELIFT, https://triplelift.com/technology (last visited April 17, 2024).



37.    If the user clears his or her cookies, then the user wipes out the TripleLift Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the TripleLift Tracker on the user's browser, (ii) the TripleLift Tracker instructs the browser to send TripleLift the user's IP address, (iii) the TripleLift Tracker stores a cookie in the browser cache, and (iv) TripleLift will continue to receive the user's IP address on subsequent Website visits with the cookie transmission.  *See* ¶ 30, *supra*; *see also* Figure 3 (showing IP address being transmitted along with the cookie).

**Figure 3:**



38.     The TripleLift Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, *supra,* 2023 WL 4833466, at *15.

39.     Further, the TripleLift Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See, e.g.*, *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

40.     Because the TripleLift Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### 2.     *GumGum Tracker*

41.     GumGum, Inc. ("GumGum") is a software-as-a-service company that develops the GumGum Tracker, which it provides to website owners, like Defendant, for a fee.

42.     According to GumGum, it "delivers the next generation of contextual intelligence, industry leading ad creatives, and the ability to measure and optimize advertising campaigns to better understand a consumer's mindset that captures attention and drives action and outcomes."[13]

43.     In other words, GumGum enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, GumGum uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

44.     Similar to above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the GumGum Tracker on the user's browser.  The GumGum Tracker, in turn, instructs the user's browser to send GumGum the user's IP address.

45.     Moreover, GumGum stores a cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the GumGum Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the GumGum Tracker causes the

---

[13] *About*, GUMGUM, https://gumgum.com/about (last visited April 17, 2024).

browser to send the cookie along with the user's IP address to GumGum.  A general diagram of this process is pictured as Figure 2, which explains how the Website causes the GumGum Tracker to install a cookie on the user's browser instructs the user's browser to send the user's IP address through the cookie.  *See* Figure 2.

46.     If the user clears his or her cookies, then the user wipes out the GumGum Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the GumGum Tracker on the user's browser, (ii) the GumGum Tracker instructs the browser to send GumGum the user's IP address, (iii) the GumGum Tracker stores a cookie in the browser cache, and (iv) GumGum will continue to receive the user's IP address on subsequent Website visits with the cookie transmission.  *See* ¶ 30, *supra*; *see also* Figure 4 (showing IP address being transmitted along with the cookie).

**Figure 4:**



47.     The GumGum Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra,* 2023 WL 4833466, at *15.

48.     Further, the GumGum Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James, supra,* 2023 WL 7392285, at *13.

49.     Because the GumGum Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### 3.    Audiencerate Tracker

50.     Audiencerate LTD ("Audiencerate") is a software-as-a-service company that develops the Audiencerate Tracker, which it provides to website owners, like Defendant, for a fee.

51.     According to Audiencerate, it "enable[s] data-driven advertising via [its] proprietary technology and platforms."[14]

52.     "One side of [Audiencerate's] business is dedicated to helping data owners monetize their data and license audiences in the world's largest programmatic media buying marketplaces.  The other side provides targeting data to marketers, enabling them to model and target audiences with more complexity and sophistication."[15]

53.     Just like TripleLift and GumGum, Audiencerate uses its Tracker to receive, store, and analyze data collected from website visitors, including visitors of Defendant's Website.

54.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the Audiencerate Tracker on the user's browser.  The Audiencerate Tracker, in turn, instructs the user's browser to send the user's IP address to Audiencerate.

55.     Moreover, Audiencerate stores a cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the Audiencerate Tracker locates the cookie identifier

---

[14] AUDIENCERATE, https://www.audiencerate.com/ (last visited April 17, 2024).

[15] *AWS Enables Audiencerate to Process Over a Billion Requests per Week*, AWS (2020), https://aws.amazon.com/solutions/case-studies/audiencerate-case-study/.

stored on the user's browser. If the cookie is stored on the browser, the Audiencerate Tracker causes the browser to send the cookie along with the user's IP address to Audiencerate. A general diagram of this process is pictured as Figure 2, which explains how the Website causes the Audiencerate Tracker to install a cookie on the user's browser instructs the user's browser to send the user's IP address through the cookie. *See* Figure 2.

56.    If the user clears his or her cookies, then the user wipes out the Audiencerate Tracker from its cache. Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the Audiencerate Tracker on the user's browser, (ii) the Audiencerate Tracker instructs the browser to send Audiencerate the user's IP address, (iii) the Audiencerate Tracker stores a cookie in the browser cache, and (iv) Audiencerate will continue to receive the user's IP address on subsequent Website visits with the cookie transmission. *See* ¶ 30, *supra*; *see also* Figure 5 showing IP address being transmitted along with the cookie.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

13

**Figure 5:**



57.     The Audiencerate Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, *supra*, 2023 WL 4833466, at *15.

58.     Further, the Audiencerate Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, *supra*, 2023 WL 7392285, at *13.

59.     Because the Audiencerate Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

4.     *Omnitag Tracker*

60.     DoubleVerify, Inc. ("DoubleVerify") is a software-as-a-service company that develops the Omnitag Tracker, which it provides to website owners like Defendant for a fee.

61.     According to DoubleVerify, it "make[s] the digital advertising ecosystem stronger, safer and more secure.  [DoubleVerify] help[s] brands improve the effectiveness of their online advertising, giving them clarify and confidence in their digital investment."[16]

62.     In other words, DoubleVerify enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, DoubleVerify uses its Omnitag Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

63.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Omnitag Tracker on the user's browser.  The Omnitag Tracker, in turn, instructs the user's browser to send DoubleVerify the user's IP address.

64.     Moreover, DoubleVerify stores a cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the Omnitag Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Omnitag Tracker causes the browser to send the cookie along with the user's IP address to DoubleVerify.  A general diagram on this process is pictured as Figure 2, which explains how the Website causes the Omnitag Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address with the cookie.  *See* Figure 2.

65.     If the user clears his or her cookies, then the user wipes out the Omnitag Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the Omnitag Tracker on the user's browser, (ii) the Omnitag Tracker instructs the browser to send DoubleVerify the user's IP address, (iii) the

---

[16] *Company*, DOUBLEVERIFY, https://doubleverify.com/company (last visited April 17, 2024).

Omnitag Tracker stores a cookie in the browser cache, and (iv) DoubleVerify will continue to receive the user's IP address on subsequent Website visits with the cookie transmission.

66.     In all cases, however, DoubleVerify receives a user's IP address each and every time a user interacts with the website of one of DoubleVerify's clients, including Defendant's Website.  Indeed, the IP address is transmitted to DoubleVerify along with the cookie value, as the below screenshot indicates.  *See* Figure 6.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

16

**Figure 6:**



67.    The Omnitag Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra,* 2023 WL 4833466, at *15.

68.    Further, the Omnitag Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James, supra,* 2023 WL 7392285, at *13.

69.    Because the Omnitag Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

5.      *Undertone Tracker*

70.      Undertone is a software-as-a-service company that develops the Undertone Tracker, which it provides to website owners like Defendant for a fee.

71.      According to Undertone, it "creates memorable ad experiences by thoughtfully orchestrating solutions across Display, Video, CTV, and DOOH."[17]  Undertone "bring[s] the art and science of advertising together to intelligently craft campaigns that uplift consumers, brands, and publishers alike."[18]

72.      In other words, Undertone enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, Undertone uses its Undertone Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

73.      The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Undertone Tracker on the user's browser.  The Undertone Tracker, in turn, instructs the user's browser to send Undertone the user's IP address.

74.      Moreover, Undertone stores a cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the Undertone Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Undertone Tracker causes the browser to send the cookie along with the user's IP address to Undertone.  A general diagram on this process is pictured as Figure 2, which explains how the Website causes the Undertone Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address with the cookie.  *See* Figure 2.

75.      If the user clears his or her cookies, then the user wipes out the Undertone Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process

---

[17] UNDERTONE, https://undertone.com/ (last visited April 17, 2024).

[18] *Id.*

begins over again: (i) Defendant's server installs the Undertone Tracker on the user's browser, (ii) the Undertone Tracker instructs the browser to send DoubleVerify the user's IP address, (iii) the Undertone Tracker stores a cookie in the browser cache, and (iv) Undertone will continue to receive the user's IP address on subsequent Website visits with the cookie transmission.

76.     In all cases, however, Undertone receives a user's IP address each and every time a user interacts with the website of one of Undertone's clients, including Defendant's Website. Indeed, the IP address is transmitted to Undertone along with the cookie value, as the below screenshot indicates.  *See* Figure 7.

**Figure 7:**



77.     The Undertone Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, *supra,* 2023 WL 4833466, at *15.  Further, the Undertone Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *James, supra,* 2023 WL 7392285, at *13.

78.     Because the Undertone Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

**B.      Defendant Installed And Used The Trackers On Plaintiff's and Users' Browsers Without Prior Consent Or A Court Order**

79.      Defendant owns and operates the Website.  The Website is an online publication whose goal is to "help[] regular people navigate the world of technology."[19]  The Website provides news and reviews of tech products to "30 million readers a month in the US, UK, Canada, Australia, Europe[,] and beyond."[20]

80.      When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[21]

81.      Often times, third-party scripts are installed on websites "for advertising purposes."[22]

82.      Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[23]

83.      Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

84.      As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.

85.      Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the IP address of visitors to the Website, including the IP address of Plaintiff and Class Members.

---

[19] TECHRADAR, https://www.techradar.com/ (last visited April 17, 2024).

[20] *About TechRadar*, TECHRADAR, https://www.techradar.com/news/about-us (last visited April 17, 2024).

[21] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ["Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…"] (last visited April 17, 2024).

[22] *Id*.

[23] *Id*.

*See* Figures 3 (TripleLift Tracker), 4 (GumGum Tracker), 5 (Audiencerate Tracker), 6 (Omnitag Tracker), and 7 (Undertone Tracker) *supra*.

86. Defendant then uses the IP address of Website visitors, including those of Plaintiff and Class Members, to serve targeted advertisements and conduct website analytics.

87. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

### C. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy

88. The collection of Plaintiff's and Class Members personally identifying, non-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

89. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

### 1. Defendant Uses The TripleLift Tracker For The Purposes Of Marketing, Advertising, And Analytics

90. TripleLift describes itself as a digital advertising platform that "work[s] for everyone: publishers who seek greater monetization, advertisers who require better performance, [and] consumers who want better ad experiences."[24]

91. TripleLift helps companies like Defendant market, advertise, and analyze user data from its website. For example, TripleLift enables publishers to place advertisements on their webpages, in videos, or embedded in broadcasts. To ensure that an effective advertisement is

---

[24] *Who We Are*, TRIPLELIFT, https://triplelift.com/company (last visited April 17, 2024).

shown to the consumer, the publisher shares data about the user with TripleLift and TripleLift serves the targeted ad.[25]

92.     TripleLift also helps advertisers select where to place their ads through "TripleLift Audiences," which "span[s] third-party and first-party data."[26]  In other words, TripleLift utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

93.     By way of example, if a home-goods brand wants to use TripleLift to serve its ads, it can purchase TripleLift's "Home Curated Deal" to reach "people who are investing their time and money close to home."[27]  By choosing this set of data, the home-goods brand will be able to target "audiences spending time on home improvement, home entertaining, outfitting their setups, browsing real estate, raising kids and adopting pets."[28]  This data set can be used for ads in the "Native, Display and Video" formats, "in placements known to deliver high viewability and high video completion rates."[29]  TripleLift ensures that the data sets "are refreshed on an on-going basis so that only the highest performing placements are included."[30]

94.     In other words, when users visit Defendant's Website, TripleLift collects users' IP addresses through its TripleLift Tracker so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by allowing third parties to collect user information.

---

[25] *See Smart Data & Targeting For Publishers*, TRIPLELIFT,
https://triplelift.com/products/audiences-publishers (last visited April 17, 2024)*.*

[26] *Smart Data & Targeting For Advertisers*, TRIPLELIFT,
https://triplelift.com/products/audiences-advertisers (last visited April 17, 2024).

[27] *HOME*, TRIPLELIFT, https://triplelift.com/exchange-traded-deals/home
(last visited April 17, 2024).

[28] *Id.*

[29] *Id.*

[30] *Id.*

2.     *Defendant Uses The GumGum Tracker For The Purposes Of Marketing, Advertising, And Analytics*

95.     GumGum is a digital advertising platform that prides itself on its "ability to measure and optimize advertising campaigns to better understand a consumer's mindset that captures attention and drives action and outcomes."[31]

96.     GumGum helps companies like Defendant market, advertise, and analyze user data from its website.  One way GumGum assists with marketing and advertising is through its Ad Exchange, which is a direct marketplace where publishers and advertisers can buy and sell digital advertising space.[32]  Thus, when a user enters a website, GumGum enables companies to instantaneously buy and sell ad space in a way that it optimized to the particular user.

97.     According to GumGum, it uses artificial intelligence to scan the information on a web page to "deliver ads that are always relevant and align with what users are watching, reading and browsing online."[33]  GumGum boasts that their "solution offers higher quality ads and increased scale across thousands of premium publisher sites" and "allow[s] advertisers to maximize their KPIs by targeting audience through customized segments such as multicultural and sustainability."[34]

98.     Notably, GumGum claims that it uses "cookieless targeting" to drive significant brand KPIs, thereby not collecting personal identifiable information.[35]  However, GumGum is setting a visitor cookie for the user session, which transmits a user's IP addresses and other pieces of information.  *See* Figure 4, *supra*.

99.     In other words, when users visit Defendant's Website, GumGum collects users' IP addresses through its GumGum Tracker so that Defendant can analyze user data, create and

---

[31] *About*, GUMGUM, https://gumgum.com/about (last visited April 17, 2024).

[32] *Exchange*, GUMGUM, https://gumgum.com/exchange (last visited April 17, 2024).

[33] *Contextual vs. Behavioral Targeting*, GUMGUM (Dec. 29, 2022), https://gumgum.com/blog/contextual-vs-behavioral-targeting.

[34] *GumGum Announces Industry's First 100% Brand Safe Ad Exchange*, GUMGUM (March 15, 2023), https://gumgum.com/press-releases/brand-safe-exchange.

[35] *Verity*, GUMGUM, https://gumgum.com/verity (last visited April 17, 2024).

analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by allowing third parties to collect user information.

     3.  *Defendant Uses The Audiencerate Tracker For The Purposes Of Marketing, Advertising, And Analytics*

  100.  Whereas TripleLift and GumGum specifically enable advertisements on websites, Audiencerate is a data platform that helps companies with audience-based marketing, advertising, and analysis.

  101.  Companies such as Defendant share their users' data with Audiencerate through "daily synchronization" via the Audiencerate Tracker.[36]  Audiencerate claims to anonymize the data and organizes it into segments.[37]  Then, companies  use the segmented data to run targeted campaigns and perform data analysis through Audiencerate's platform.[38]  *See* Figure 8.

**Figure 8:**



---

[36] AUDIENCERATE, https://www.audiencerate.com/ (last visited April 17, 2024).

[37] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home (last visited April 17, 2024).

[38] *Id.*

102.    In addition to helping companies make better use of their own customer data, Audiencerate helps companies *sell* their customers' data to further "monetize data."[39]

103.    In order to perform the functions listed above, Audiencerate needs to collect data that identifies a particular user.  This is why Audiencerate collects IP addresses: it allows Audiencerate to segment users in order to run targeted campaigns and perform data analysis.

104.    In other words, companies like Defendant are allowing Audiencerate to collect users' data to increase Defendant's revenue, whether it is by optimizing marketing campaigns or by purely selling the data.

    *4.    Defendant Uses The Omnitag Tracker For The Purposes Of Marketing, Advertising, And Analytics*

105.    DoubleVerify is a digital advertising platform that takes pride in the fact that "[h]undred of companies turn to DoubleVerify for … [its] solutions across every major vertical, including Financial Services, Telecom, Automotive, Retail, CPG, Travel, Luxury, Pharmaceuticals and more."[40]

106.    DoubleVerify helps companies like Defendant market, advertise, and analyze user data from its website.  For example, DoubleVerify enables publishers to place advertisements on their webpages, social media, or in videos.  DoubleVerify "provides [publishers] the measurement, insights and tools to improve ad delivery, enhance inventory quality and drive performance – all with the goal of boosting yield."[41]  This is because, according to DoubleVerify, "[p]ublishers deserve to be compensated for the quality content and programming they create."[42]

---

[39] *Audiencerate partnership sees Sirdata integrated on Adform marketplace for the first time*, SIRDATA (Dec. 10, 2020), https://news.sirdata.com/en/press-release-audiencerate-sirdata-partnership/.

[40] *Company*, DOUBLEVERIFY, https://doubleverify.com/company/ (last visited April 17, 2024).

[41] *Publishers*, DOUBLEVERIFY, https://doubleverify.com/company/ (last visited April 17, 2024).

[42] *Id.*

Case 1:24-cv-02931   Document 1   Filed 04/18/24   Page 26 of 34

107.    DoubleVerify also helps advertisers select where to place their ads.  DoubleVerify "ensure[s] that ads meet [] quality criteria, across channels, formats and platforms – giving [its] customers clarify and confidence in their digital investment."[43]  DoubleVerify also ensures that the "[Advertisers are] in Control" by providing "its proprietary Authentic Ad metric that shows which ads were seen, by a real person … *in the intended geography.*"[44]

108.    In order to perform the functions listed above, DoubleVerify needs to collect data that identifies a particular user.  This is why DoubleVerify collects IP addresses: it allows DoubleVerify to ascertain a user's identity and target that user with personalized advertisements, as well as to track a user's Website activity over time (*i.e.*, through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity.

109.    In other words, when users visit Defendant's Website, Omnitag through its Omnitag Tracker collects' users' IP addresses so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by allowing third parties to collect user information.

     5.    *Defendant Uses The Undertone Tracker For The Purposes Of Marketing, Advertising, And Analytics*

110.    Undertone is a digital advertising platform that takes pride in its "20 years of experience and billions of impressions worth of data to intelligently craft campaigns that can drive full-funnel KPIs while making meaningful connections with the 200MM+ unique users they can reach every month."[45]

---

[43] *Brands and Agencies*, DOUBLEVERIFY, https://doubleverify.com/brands-and-agencies/ (last visited April 17, 2024).

[44] *Measurement & Analytics*, DOUBLEVERIFY, https://doubleverify.com/capabilities-measurement-analytics/ (last visited April 17, 2024) (emphasis added).

[45] *Company*, UNDERTONE, https://undertone.com/company/ (last visited April 17, 2024).

111.    Undertone helps companies like Defendant market, advertise, and analyze user data from its website.  For example, Undertone enables publishers to place advertisements on their webpages, apps, or in videos across desktop, mobile, tablet, and television.[46]

112.    Undertone also helps advertisers select where to place which of their ads.  For example, Undertone provides "[v]ideo creative that dynamically optimizes in real time based on _location_, weather, audience & more."[47]  Undertone's "technology not only adjusts copy, but splices entirely different video assets together to form a _completely personalized experience_ for each user."[48]

113.    Furthermore, Undertone provides its clients with "advanced data capabilities" to "reach[] clients' audience[s]."[49]  For example, Undertone enables companies to "[t]arget audiences within a specified location with hyper-local messaging including closest retailer, price & offer messaging or weather triggered messaging."[50]

114.    In order to perform the functions listed above, Undertone needs to collect data that identifies a particular user.  This is why Undertone collects IP addresses: it allows Undertone to ascertain a user's identity and target that user with personalized advertisements, as well as to track a user's Website activity over time (_i.e._, through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity.

115.    In other words, when users visit Defendant's Website, Undertone through its Undertone Tracker collects' users' IP addresses so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups

---

[46] _Publisher_, UNDERTONE, https://undertone.com/solutions/publisher/ (last visited April 17, 2024).

[47] _High Impact Video_, UNDERTONE, https://undertone.com/solutions/video/ (last visited April 17, 2024) (emphasis added).

[48] _Id._ (emphasis added).

[49] _Commerce Solutions_, UNDERTONE, https://undertone.com/solutions/commerce-solutions/ (last visited April 17, 2024).

[50] _Id._

of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by allowing third parties to collect user information.

### III.    PLAINTIFF'S EXPERIENCE WITH THE TRIPLELIFT TRACKER

116.    Plaintiff has visited the Website multiple times—including as long ago as 2020 and as recently as April 2024—on his desktop browser.

117.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Omnitag and Undertone Trackers to be installed on Plaintiff's browser. Defendant, DoubleVerify, and Undertone then used the Trackers to collect Plaintiff's IP address. *See* Figures 9 (Omnitag Tracker) and 10 (Undertone Tracker).

**Figure 9:**



**Figure 10:**



| Name | Value |
|---|---|
| bannerid | 1453509 |
| bk | sa1vo8 |
| id | 9495dbc66d474a0982ea02b60fc41c60 |
| bidid | 9495dbc66d474a0982ea02b60fc41c60 |
| pid | 2731 |
| ut_pii_allowed | 1 |
| has_capping | 0 |
| ut_placement_id | 2731025 |
| ip | 24.4.28.215 |
| campaignid | 361127 |
| aduid | 58 |
| om | 1 |
| io | 701801 |
| io_li | 261574 |
| placement_type | STANDARD |

118.     Defendant, DoubleVerify, and Undertone used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's location, and ultimately boost Defendant's and advertisers' revenue.

119.     Plaintiff did not provide his prior consent to Defendant to install or use the Omnitag or Undertone Trackers on Plaintiff's browser.

120.     Defendant did not obtain a court order before installing or using the Omnitag or Undertone Trackers.

121.     Plaintiff has, therefore, had his privacy invaded by Defendant's violations of CIPA § 638.51(a).

122.     Although Defendant utilizes at least five different Trackers on the Website (TripleLift, GumGum, Audiencerate, Omnitag, and Undertone), they all operate in the same manner and perform the same function, *i.e.*, collecting Plaintiff's and Class members' IP addresses. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses.

123.     Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers.

124.    Defendant did not obtain a court order before installing or using the Trackers.

125.    Thus, like Plaintiff, Class Members have also had their privacy invaded by Defendant's violations of CIPA § 638.51(a).

## CLASS ALLEGATIONS

126.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

127.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

128.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

129.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)      Whether Defendant violated CIPA section 638.51(a);

(b)      Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(c)      Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(d)      Whether Defendant sought or obtained a court order for its use of the Trackers; and

(e)      Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

130.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had their IP address collected by the Trackers, which were installed and used by Defendant.

131.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

132.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**
**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

133.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

134.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

135.    CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

136.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

137.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

138.    At all relevant times, Defendant installed the Trackers—which are pen registers— on Plaintiff's and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP addresses.

139.    The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website.  *In re Zynga Privacy Litig.,* 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

140.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

141.    Defendant did not obtain a court order to install or use the Trackers.

142.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)    For pre- and post-judgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief; and

(g)    For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated: April 18, 2024                    Respectfully submitted,

                                        **BURSOR & FISHER, P.A**.

                                        By: */s/ Yitzchak Kopel*
                                              Yitzchak Kopel

                                        Yitzchak Kopel
                                        Alec M. Leslie
                                        Max S. Roberts
                                        1330 Avenue of the Americas, 32nd Floor
                                        New York, NY 10019
                                        Telephone: (646) 837-7150

Facsimile: (212) 989-9163
Email: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*